**GENERAL ELECTRIC CREDIT COR-
PORATION, Plaintiff-Appellant,**

v.

**T. R. GRUBBS, d/b/a T. R. Grubbs Tire
& Appliance, Defendant-Appellee.**

**No. 29961.**

United States Court of Appeals,
Fifth Circuit.

April 13, 1973.

Rehearing Denied May 14, 1973.

Hubert D. Johnson, Dallas, Tex., for plaintiff-appellant.

J. R. Cornelius, Bill J. Cornelius, Jefferson, Tex., for defendant-appellee.

B. A. Britt, Jr., Texarkana, Tex., for Goodyear Tire & Rubber Co.

Roby Hadden, U. S. Atty., Tyler, Tex., for United States.

Before GEWIN, THORNBERRY and CLARK, Circuit Judges.

THORNBERRY, Circuit Judge:

General Electric Credit Corporation (GECC), plaintiff below, appeals from a judgment denying it recovery on a note and awarding defendant-appellee Grubbs a $20,000 recovery on his counterclaim. We reverse the judgment below.

Grubbs operated an appliance store in Jefferson, Texas, and sold General Electric products. He financed his purchases of inventory by means of two distinct arrangements with GECC, a wholly-owned subsidiary of General Electric Corporation. Pursuant to the first of these arrangements, known as trust re-

ceipts financing or "floor planning," he paid ten percent of the price of inventory purchased from General Electric, and borrowed the balance from appellant. Merchandise purchased under this arrangement was held by Grubbs in trust, and he was to pay GECC the balance of the purchase price promptly upon sale of the merchandise to a customer.[1] Should Grubbs fail to pay the balance promptly upon sale to the customer, the sale was referred to as a "sale out of trust."

Under the second financing arrangement—the one giving rise to the note upon which appellant brought suit—Grubbs sold to GECC chattel mortgages, notes, and other accounts generated by his sales to customers. The 1955 agreement governing these sales of "chattel paper" obligated GECC to purchase only those accounts that it deemed "acceptable." If a customer defaulted on two or more installments under an account sold to GECC, Grubbs was required, upon demand by GECC, to repurchase that account for cash. If, thirty days after GECC had demanded the repurchase of a defaulted account, Grubbs had not repurchased it, then Grubbs became obligated to repurchase *all* of the accounts he had sold to GECC, whether they were in default or not.

By March 1964, ninety-four of the accounts that Grubbs had sold to GECC, amounting to roughly $67,000, were in default by two or more installments, and Grubbs had not repurchased them as required by the 1955 agreement. Rather than forcing Grubbs to repurchase all of the outstanding accounts sold to GECC (which by this time numbered 671 and amounted to roughly $270,000, exclusive of the ninety-four defaulted accounts),

or suing him on his repurchase obligation, GECC proposed that Grubbs execute a note representing the amount due in cash under the repurchase obligation ($67,000) payable in monthly $1500 installments beginning on April 11, 1964.[2] Grubbs and his wife signed the note, telling GECC representatives that they "owed it and had to pay it anyway." Grubbs and his wife testified that appellant induced them to sign the note by assuring them that they would have the sole right to make collections and repossessions under the ninety-four accounts, and by promising to continue purchasing Grubbs' customers' accounts "as before," which Grubbs understood to mean that appellant would purchase substantially all of the chattel paper he tendered. GECC officials, however, testified that Grubbs' obligation to pay the note was not contingent upon GECC's continued purchase of chattel paper. It is clear, nonetheless, that even if appellant did undertake to "continue" purchasing chattel paper from Grubbs "as before," this would obligate appellant to purchase only the accounts it considered "acceptable": appellant promised to do nothing more than it was required to do under the 1955 agreement, and that agreement was not materially modified by the March 1964 note.

After paying the first $1500 installment on April 11, 1964, Grubbs refused to make further payments; and GECC sued to recover the balance on September 3, 1964. In October 1966 Grubbs amended his answer in several material respects.[3] First, he asserted that the note was unenforceable because of fraudulent inducement and total failure of consideration. Secondly, he asserted

1. Under the "floor plan" agreement, GECC had the right to accept the customer's account in lieu of Grubbs' payment of the balance.

2. In 1963, Grubbs had executed another note to GECC, representing his liability to repurchase $69,000 in defaulted paper sold to GECC.

3. GECC had brought suit in state court in Marion County, Texas. By his amend-

ed pleading, Grubbs made the United States a party to the suit, in order to obtain a determination of priorities among a number of judgment lienholders including the United States (which had obtained judgment under a note assigned to the Small Business Administration). The United States removed the suit to the United States District Court for the Eastern District of Texas.

a "cross-action" (actually, a counter-claim against appellant and a third-party action against General Electric Corporation) alleging that appellant and General Electric had violated federal and Texas antitrust laws and that they had embarked upon a scheme resulting in the total destruction of Grubbs' business.[4] The trial judge, sitting without a jury, heard testimony for two days, and then declared the note unenforceable for fraud and failure of consideration, awarded Grubbs a $20,000 recovery against GECC alone on his claim of "destruction of his business," and denied all other claims for relief (including the alleged antitrust violations).

### The Note

On appeal, Grubbs reiterates three theories advanced in the court below in support of his claim that the note was unenforceable because of total failure of consideration. First, he argues that he was required to pay the note only if appellant continued to purchase and pay him for chattel paper tendered to it, and that GECC breached this obligation while the note was still current. As mentioned earlier, it is not at all clear what appellant promised in return for Grubbs' signing the note,[5] but in no event did it undertake more than to *continue* purchasing only "acceptable" paper, as it had done under the 1955 agreement. In any event, after Grubbs had made the first payment on April 11, 1964, he tendered approximately $2600 in accounts to GECC, who at first refused to accept them because they were unacceptable credit risks, but who later accepted accounts worth approximately $1530. Rather than sending Grubbs the cash, however, appellant credited this amount to reserve accounts (established to insure Grubbs' performance of his obligations under the financing arrangements) to cover some $1700 in worthless checks (drawn by Grubbs and by his customers) that Grubbs had tendered as customer payments on accounts sold to GECC and as remittances from Grubbs in payment for trust receipt merchandise.[6] Since the financing arrangements required Grubbs to cover any worthless checks he sent to GECC, there was no practical difference between sending Grubbs the cash and crediting his account to cover the checks. This incident, therefore, was not a failure of consideration. Likewise untenable is the claim that the note was induced by a fraudulent promise to continue purchasing Grubbs' chattel paper. In refusing to accept some accounts, and in crediting the proceeds of others to the reserve accounts, GECC did no more than it had a right to do under the original agreements with Grubbs.

The second alleged instance of failure of consideration was appellant's sending "direct pay" notices to Grubbs'

---

4. As to the acts committed in furtherance of this scheme, Grubbs claimed that GECC had refused to purchase any chattel paper from him after execution of the March 1964 note; that GECC employees had repossessed merchandise covered by some of the ninety-four defaulted accounts charged back to Grubbs pursuant to the note, and in so doing had slandered Grubbs; that GECC had notified Grubbs' customers not to make further payments to him; and that GECC had wrongfully terminated trust receipts financing before Grubbs' franchise had expired. Many of the acts alleged as a basis for recovery under the counterclaim against GECC were also asserted as defenses to the note.

5. Under Texas law, Grubbs' pre-existing repurchase obligation was itself sufficient consideration for the 1964 note. Tex.Rev. Civ.Stat.Ann. (Bus. & Comm.) arts. 3.303, 3.408, V.A.T.S.; West Coast Mining Co., Inc. v. Security National Bank, 442 S.W. 2d 821 (Tex.Civ.App., Amarillo, 1969, writ ref'd n. r. e.).

6. In response to a hypothetical question, a GECC official testified that GECC violated the March 1964 agreement by crediting $1530 to Grubbs' reserve account instead of sending him the cash. But the hypothetical question made no reference to the worthless checks that Grubbs had sent to GECC; thus, this testimony affords no basis for finding failure of consideration in appellant's crediting the money to the reserve account.

customers, instructing them to make remittances directly to GECC. Appellant was authorized to make collections on accounts that it had purchased; but Grubbs argued that in some cases a notice was sent to a customer, one of whose accounts had been purchased by GECC but whose other account either had not been sold to GECC or had been charged back to Grubbs pursuant to the March 1964 note. These customers, unable to distinguish between accounts owed to GECC and accounts owed to Grubbs, simply stopped paying Grubbs altogether, although Grubbs allegedly was to have the sole right to make collections and repossessions on the ninety-four defaulted accounts represented by the March note. As of August 1964, when the direct pay notices were sent, however, Grubbs was in default on the note, having repudiated it in May or June; and Grubbs will not be heard to justify that repudiation by events occurring months later. It is even possible that sending the direct pay notices to the ninety-four defaulted accounts was not in violation of the March agreement, because GECC officials testified that Grubbs was to have a right to make collections on those accounts only if he continued paying the note.

▪ Thirdly, Grubbs contends that termination of trust receipts financing before his franchise expired was a failure of consideration. But there is absolutely no evidence that continuation of trust receipts financing was promised in consideration for the note. Moreover, when trust receipts financing was terminated in August 1964, Grubbs was "short" by over $6,000 due to "sales out of trust," and admittedly could not make up the shortage.

In summary, the trial court erred by denying recovery to GECC on the note. Appellant is entitled to recover the balance due under the note, plus reasonable attorneys' fees (Vernon's Tex.Rev.Civ. Stat.Ann. art. 2226).

## The Counterclaim

Here we are concerned only with GECC's alleged liability for the acts it committed pursuant to the scheme to "totally destroy" Grubbs' business. The trial court exonerated General Electric Corporation, and denied Grubbs' claims under the antitrust laws; and Grubbs does not allege that that part of the judgment was erroneous.

Besides the conduct which we have seen to be authorized by Grubbs' agreements with GECC,[7] the allegedly wrongful acts fall roughly into four categories: (1) failure to credit Grubbs for the price of some inventory removed from his floor when trust receipts financing was terminated;[8] (2) "slanderous accusations" by GECC employees that Grubbs had cheated both his customers and GECC by failing to remit customer payments on accounts purchased by GECC; (3) the mailing of "direct pay" notices to accounts that Grubbs had the exclusive right to collect; (4) appellant's wrongful repossession from customers of merchandise on which it had no lien, and its sale of that merchandise without giving Grubbs the right to bid.

▪▪ *"Slanderous Accusations"*:[9] Several of Grubbs' customers testified

---

7. Although Grubbs sought affirmative recovery for appellant's failure to purchase and pay for some customers' accounts and for terminating trust receipts financing in August 1964, the foregoing discussion has shown that none of these acts was improper under Grubbs' agreements with GECC.

8. Appellant concedes that Grubbs is entitled to credit for such merchandise. The trial produced only a rough estimate (ap-

proximately $1,000) of the amount of this credit, and on remand the trial court must establish precisely the amount of credit due Grubbs.

9. Appellant contends that these statements, made between July 1964 and January 1965, give rise to a cause of action in slander; since recovery was not sought for them until October 1966, when Grubbs amended his pleading, Grubbs' recovery for these statements is, says appellant,

that men who "represented themselves to be" or "purported to be" GECC employees [10] visited them in 1964 and 1965, and said that Grubbs had swindled them and cheated GECC by failing to remit to GECC customer payments collected by Grubbs and owed to GECC under accounts GECC had purchased. In order to hold GECC liable for these statements, Grubbs of course had the burden of proving that the men were in fact GECC employees and that the statements were made in the course of their employment; but we have combed the record in vain for competent proof of either of these elements. The customers' recollections of what the men represented themselves to be was hearsay,[11] and Texas courts hold that such testimony, even if admitted without objection, is no proof at all of agency or scope of employment. Lewis v. J. P. Word Transfer Co., 119 S.W.2d 106 (Tex.Civ.App., Dallas 1938, writ ref'd). Even if the "men" themselves had testified, their testimony standing alone would not have supported a finding of agency. Robertson Tank Lines, Inc. v. VanCleave, 468 S.W.2d 354 (Tex.1971). Grubbs was not entitled to any recovery for the allegedly "slanderous accusations" made to his customers.

■ *"Direct Pay" Notices:* From our review of the record, we cannot say that the trial court clearly erred in determining that GECC was liable to Grubbs for the injury caused by sending "direct pay" notices to customers some of whose accounts were owed solely to Grubbs. We are, however, unable to determine how many of Grubbs' (as distinct from GECC's) accounts were sent the notices, or to determine the amount of customer payments that Grubbs lost when his customers stopped paying in reliance on the notices. We accordingly remand to the court below for determination of the amount of damages due Grubbs for GECC's mailing the direct pay notices.

■ *Wrongful Repossession and Sale:* Again, appellant does not seriously dispute Grubbs' claim of damages for GECC's repossession from customers of merchandise on which GECC had no lien. Some of the repossessed merchandise had been purchased from Grubbs on open account, and Grubbs had not financed his purchase of the merchandise with GECC. Other repossessed merchandise was covered by the ninety-four defaulted accounts represented by the March 1964 note, and we cannot say that the trial court clearly erred in finding that Grubbs had the sole right to make collections and repossessions on these accounts. GECC disposed of this repossessed merchandise in two sales. During the first, Grubbs and his wife's brother-in-law were permitted to bid on the merchandise after opening the bids of other prospective purchasers. Grubbs was not, however, permitted to bid at the second sale. But again we are compelled to remand to the court below for a precise determination of the amount of damages caused by the wrongful repossessions and sale.

■ Needless to say, we cannot accept the trial court's award of $20,000 as a blanket recovery for "destruction of Grubbs' business." The evidence tended

barred by the Texas one-year statute of limitations applicable to slander. On the other hand, Grubbs argues that the statements were merely part of a scheme designed to ruin his business, and that the one-year statute is inapplicable under Brown v. American Freehold Land Mortgage Co., 97 Tex. 599, 80 S.W. 985 (1904). Owing to the approach we take to this part of Grubbs' counterclaim, we intimate no view as to this controversy.

10. None of these men testified at trial.

11. The representations of agency cannot even be brought within the amorphous confines of Texas' "res gestae" exception to the hearsay rule. Grubbs made no attempt to show that the purported agents were "in the instant grip of violent emotion, excitement or pain," 1 McCormick & Ray, Texas Law of Evidence 684 (2d ed. 1956), while "representing" themselves to be GECC agents.

to show that Grubbs had been operating at a loss prior to the events giving rise to the instant suit, and that it was only a matter of time until his business failed. On remand, Grubbs' recovery is to be limited to (1) credit for "trust receipt" merchandise which was not credited to him when trust receipts financing was terminated, (2) Grubbs' losses on accounts which he had the sole right to collect, caused by the mailing of the "direct pay" notices, and (3) credit for merchandise wrongfully repossessed from Grubbs' customers and sold.

In summary, we reverse as to the trial court's failure to award GECC a judgment on the note; we reverse the award of $20,000 in damages on Grubbs' counterclaim, and remand for a precise determination of damages on his counterclaim.

Costs shall be taxed to appellee.

Reversed and remanded.